**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**
**CRIMINAL ACTION NO.  3:15-CR-93-FDW-DCK**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** )<br>)<br>**Plaintiff,** )<br>)<br>**v.** )<br>)<br>**DIANDRE HAKEEM GRIFFIN,** )<br>)<br>**Defendant.** )<br>_____ ) | **MEMORANDUM AND**<br>**RECOMMENDATION** |

**THIS MATTER IS BEFORE THE COURT** on Defendant Diandre Hakeem Griffin's "Motion to Suppress"  (Document No. 10), the "United States' Response To Defendant's Motion To Suppress" (Document No. 20), and the "United States' Supplemental Memorandum In Support Of Its Response To Defendant's Motion To Suppress" (Document No. 24).  The pending motion has been referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. §636(b), and is now ripe for disposition.  Having carefully considered the arguments, the record, and the applicable authority, the undersigned will respectfully recommend that the motion be <u>granted</u> in part and <u>denied</u> in part.

## I.        PROCEDURAL BACKGROUND

In  a "Bill of Indictment" (Document No. 1) filed April 22, 2015, Defendant Diandre Hakeem Griffin ("Defendant") was charged with knowingly and unlawfully possessing a firearm having been previously convicted of a felony, in violation of Title 18, United States Code, Section 922(g)(1).

On October 12, 2015, Defendant filed a "Motion to Suppress" (Document No. 10) alleging violations of Defendant's constitutional rights.  The "United States' Response To Defendant's

Motion To Suppress" (Document No. 20) was filed on October 22, 2015.  The "United States'

Supplemental Memorandum In Support Of Its Response To Defendant's Motion To Suppress"

(Document No. 24) was filed on October 27, 2015.  The undersigned conducted a hearing

regarding this matter on January 11, 2016 and January 12, 2016.

## II.    FACTUAL BACKGROUND[1]

In the course of its investigation of a murder and (separate) armed robbery/shooting

involving one "C.R.," on November 16, 2013, law enforcement monitored an early-morning phone

call from C.R. to Defendant.  (Document No. 20, p.1).  During that phone conversation, C.R.

admitted that he had committed the armed robbery and asked Defendant to retrieve a black book

bag from the possession of a female, "L.B.," who had been storing the bag in an attic.  (Document

No. 20, p.2).  Defendant agreed.  Id.

Later that day, C.R. called L.B. to inform her that Defendant would be coming to see her.

Id.  Shortly thereafter, while C.R. was speaking with L.B. on a second call he placed to her,

Defendant arrived at L.B.'s house.  Id.  L.B. passed the phone to Defendant, who confirmed that

he "already got" "that stuff in the attic."  Id.

On the morning of November 22, 2013, law enforcement personnel met, as they did each

morning in the days immediately following the homicide, to discuss the status of the investigation

and the steps they would take that day.[2]  (Document No. 30 at 46:50-48:45, 1:25:16-1:25:43).

Following that meeting, law enforcement officers set out to locate Defendant.  (Document No. 20,

p.2).  Two of the officers involved were North Carolina State Bureau of Investigation Special

Agent Brandon Blackman ("Blackman") and Monroe Police Department Detective Nicholas

---

[1] The following is not intended to be a comprehensive statement of facts, nor to reconcile all of the discrepancies in the events as presented by Defendant and by the Government.

[2] The same day, a warrant had been issued for Defendant's suspected residence located on Hasty Road in Monroe.

Brummer ("Brummer"). (Document No. 20, p.1). Brummer rode with Blackman that morning in Blackman's Bureau-issued, unmarked, white Ford Fusion. (Document No. 20, p.2; Document No. 31 at 17:46-18:14). Blackman wore plain clothes. (Document No. 20, p.2). Brummer wore an "on call" uniform—cargo pants and a black polo with "POLICE" printed on the front and back; and an unmarked jacket that fully covered his police polo. Id. Both Blackman and Brummer were armed, although their weapons were not visible under the jackets each wore. (Document No. 30 at 20:18-20:30; Document No. 31 at 9:35-9:37).

Sometime before 9:00 a.m., Monroe Police Department Detective Gabe Broome ("Broome") located Defendant's vehicle at 504 Brown Street, Monroe, at the corner of Brown and Stafford Streets. (Document No. 20, p.2). Broome parked his unmarked vehicle on Stafford Street approximately 200 yards from the house and informed other law enforcement personnel that he had located Defendant's vehicle. (Document No. 20, p.2; Document No. 31 at 48:48-49:07). Blackman and Brummer received that report and headed to 504 Brown Street. (Document No. 20, p.2). When they arrived at approximately 9:30 a.m., Broome, also in plain clothes, was on the street in front of the residence. (Document No. 20, p.2; Document No. 31 at 52:38-52:52). They parked on Brown Street directly in front of and some ten feet from the house. (Document No. 31 at 51:33-52:06). Broome voluntarily positioned himself at the back of the house while Blackman and Brummer went to the door to conduct a "knock and talk." (Document No. 30 at 1:29:29-1:29:46; Document No. 31 at 53:00-53:34).

Blackman and Brummer stepped onto the front porch of 504 Brown Street and knocked.[3] (Document No. 20, p.3; Document No. 10, p.3). Ms. Shannon, Defendant's girlfriend, opened

---

[3] The residence has both a storm or screen door and a wooden door. It is unclear from the testimony whether Blackman and Brummer opened the outer door to knock, but no allegation has been made that they searched the residence at this point.

the door.  (Document No. 10, p.3).  Blackman asked if Defendant was there.  (Document No. 10, p.3).  Ms. Shannon said that he was there, agreed to get Defendant, and closed the door.  (Document No. 20, p.3;  Document No. 31 at 1:25:08-1:25:17).  Several minutes later, Defendant opened the front door wearing only boxer shorts.  (Document No. 10, p.3;  Document No. 30 at 21:20-21:36; Document No. 31 at 11:55-12:23).  Blackman asked if Defendant was willing to speak with them. (Document No. 10, p.3).  Defendant agreed, then shut the front door and re-emerged several minutes later, still shirtless but wearing a jacket and pants.  (Document No. 20, p.3).  Defendant stepped outside and shut the door behind him.  (Document No. 10, p.3;  Document No. 20, p.3; Document No. 30 at 21:35-21:45;  Document No. 31 at 12:53-13:02).  Though Defendant alleges that Blackman indicated that he and Brummer wished to speak with Defendant outside, the Government contends that Defendant stepped outside voluntarily.  (Document No. 10, p.3; Document No. 20, p.3;  Document No. 30 at 21:35-21:45;  Document No. 31 at 12:53-13:02).

Blackman testified that because Defendant did not invite the officers in and it was cold outside, Blackman asked Defendant if they could talk in Blackman's vehicle where it would be more comfortable than the small porch.  (Document No. 31 at 13:01-13:30).  Brummer testified that he thought that speaking with Defendant in the vehicle was appropriate to protect Defendant's privacy.  (Document No. 30 at 22:19-22:40).  The officers allege that Defendant agreed to speak to them in the vehicle and walked to the vehicle voluntarily. (Document No. 30 at 22:19-22:40; Document No. 20, p.3).  Blackman told Defendant he could sit up front, and Defendant opened the door himself and got in.  (Document No. 20, p.3;  Document No. 30 at 23:00-23:10).  Defendant contends in his Motion to Suppress that there was a third officer at the door, that four law enforcement vehicles were visible from the front door of the residence, and that Defendant passed

three additional officers as officers "led" Defendant to Blackman's vehicle. (Document No. 10, p.3).

Once in the vehicle, Blackman commenced almost immediately to ask Defendant about the black bag he believed to be in Defendant's possession. (Document No. 20, p.3). Initially, Defendant denied knowing anything about the bag, which Defendant characterizes as "resisting interrogation." (Document No. 10, p.4). Blackman then cautioned Defendant that Defendant "did not want to get caught up in a murder investigation," and he revealed to Defendant what he had overheard on the jail calls. (Document No. 20, p.4; Document No. 10, p.4). Defendant then admitted that he had retrieved the book bag, that the book bag contained a shotgun, and that the shotgun was in the residence. (Document No. 20, pp.3-4; Document No. 10, p.4). Blackman told Defendant that the officers needed the shotgun. (Document No. 20, p.4). Without discussion, Defendant got out of the vehicle and walked back toward the house. (Document No. 20, p.4; Document No. 10, p.4).

Defendant proceeded into the house, and Blackman and Brummer followed. (Document No. 10, p.4; Document No. 30 at 25:05-25:50; Document No. 31 at 18:09-18:16). Several other officers, including Broome and Detective Shannon Huntley, were inside at this time, talking with Ms. Shannon. (Document No. 20, p.4 n.2). Blackman allegedly told Ms. Shannon that they were going to enter a bedroom to retrieve a shotgun that was within. (Document No. 31 at 18:16-18:50). Ms. Shannon became agitated, and said something to the effect of "there better not be a shotgun in this house."[4] Id. Defendant then "led" Blackman into the bedroom; Brummer stood in the doorway. (Document No. 30 at 25:05-25:50; Document No. 31 at 18:09-18:16). Blackman could

---

[4] Ms. Shannon testified that she was neither asked for nor gave consent to search at that time. Her consent to search was requested only after Blackman had searched the bedroom. Because Ms. Shannon's consent is in dispute, the Government relies solely on Defendant's consent to search, which is contested as involuntary.

see what looked like marijuana in plain view, as well as a set of digital scales. (Document No. 20 p.4). Defendant reached up into the closet and began to remove an object. Id. Blackman instructed Defendant to put it back. Id. Confirming that the object was a shotgun, Blackman asked Defendant if he was a felon. Id. Defendant admitted that he was a felon, to which Blackman replied, "You know what that means." (Document No. 20, p.4). It is disputed whether Defendant was then placed in handcuffs or whether he remained physically unrestrained at that point. (Document No. 10, p.8; Document No. 30 at 26:46-27:00; Document No. 31 at 21:25-21:40). However, officers informed Defendant that they would need to speak with him at the Monroe Police Department, and the Government concedes that Defendant was taken into custody at that time. (Document No. 20, pp.4, 9).

Defendant was transported to the Monroe Police Department and placed in an interrogation room. (Document No. 10, p.4; Document No. 20, p.4). There, presented with a written Miranda waiver form, Defendant initialed a portion of the form acknowledging that he understood his rights. (Document No. 31 at 33:02-33:43). However, when Brummer recited the waiver statement which read "[n]o promise or threats have been made to me and no pressure or coercion of any kind has been used against me," the following exchange took place:

| | |
|---|---|
| Griffin: | Nah, I ain't going to sign that one right there. |
| Brummer: | You're not going to sign there? |
| Griffin: | Nah, cause I don't know what's going on. He said he going to charge me with the gun, just go ahead and just . . . |
| Blackman: | Okay, so you don't want to talk about it? |
| Brummer: | You don't want to talk. |
| Griffin: | Nah, you wanna charge me with the gun and I'm trying to help this man [meaning Blackman]. I feel I'm a felony [*sic*], I feel that. I understand that I'm a felon but you going to charge me and you going to get me to take you to the gun. That's all you said, take me to the . . . you didn't say nothing about charging me. |

| | |
|---|---|
| Blackman: | Well, I can't not . . . |
| Griffin: | I understand you, I understand it's your job but I'm just saying. |
| Blackman: | Here's the deal . . . |
| Griffin: | But you trying to place me at something. Come on, man. |
| Blackman: | I asked you, all I asked you was . . . |
| Griffin: | Where's the bag at? And I came honest and told you the truth—what was in the bag—this is how you going to do me? |
| Brummer: | Diandre. |
| Blackman: | Diandre. |
| Griffin: | Nah, you might as well go ahead and take me to the county. You know me, charge me with firearm by felon, come on man, that's messed up, man. |
| Blackman: | Well . . . |
| Griffin: | I just tried to help you and you going to come charge me like that, man. |
| Blackman: | Okay, Diandre. |
| Griffin: | This is dirty, man. |
| Brummer: | You going to listen to him or you done? |
| Griffin: | Yeah, I'm listening to him, man. |
| Blackman: | Okay, here's the thing. Alright, all I asked you was if you were a felon and what did you say? |
| Griffin: | Yes. |
| Blackman: | And then I asked you, I said, well you understand what that means. |
| Griffin: | Yeah but look. |
| Blackman: | What did you say? |
| Griffin: | But look. |
| Blackman: | No, no, hang on just let me ask the questions first and then I'll, what did you say? |
| Griffin: | Yeah. |
| Blackman: | You said you were. Okay? I can't look the other way on that. I can't. |
| Griffin: | But look though . . . |
| Blackman: | But also I can't look the other way on that brick of marijuana that's sitting there either, I can't look the other way on that. |
| Griffin: | That ain't no brick. |
| Blackman: | But, well, whatever it was, okay, but look, but listen, listen . . . |
| Griffin: | But . . . |
| Blackman: | I can't, I can't sit here and argue with you. |
| Griffin: | I'm not, I'm not arguing. |

| | |
|---|---|
| Blackman: | Either you're going to talk to us and waive your rights . . . I can't cause we can't talk to you without giving you those rights. |
| Griffin: | I know that but, I understand, I understand. |
| Blackman: | And I appreciate you, you . . . |
| Griffin: | But you said help you and I helped you. That's all I know about all this, man. |
| Blackman: | Okay, well . . . |
| Griffin: | I went and got a bag from him. |
| Blackman: | Okay, okay, well if that's all you know about it, Diandre, then that's all you know about it. |
| Griffin: | Yeah that . . . |
| Blackman: | But all I want to do is talk to you more about it but if you don't want to talk more about it, then that, that is you right and I can't, I can't force you to. Okay, so that's all, that's why we have to read you your rights. |
| Griffin: | But I'm just saying that's just messed up though, man. |
| Blackman: | I'm sorry you feel it's messed up but . . . |
| Griffin: | I did not even know you were going to charge me with that. |
| Blackman: | I have to do my job, okay, I have to do my job. Alright and I understand you saying you, if you were helping a friend out, I understand that. But I can't ask you any questions and we can't get to the bottom of this whole deal unless you talk to us. So if you don't want to talk to us, that's your right. |
| Griffin: | Yeah, I'm good man, just . . . |
| Blackman: | Alright. |
| Griffin: | Book me, man. |

(Document No. 31 at 33:41-36:29).

At the conclusion of this exchange, Brummer gave Defendant his card and told Defendant to contact him if Defendant later wished to speak with him, but "in the meantime," to "sit tight." (Document No. 30 at 38:48-38:59). Blackman and Brummer patted down Defendant and removed personal items from Defendant's possession to prepare Defendant to be transported to the Union County Jail for arrest processing. (Document No. 20, p.6). When the officers removed Defendant's cellular phone from his pocket, Defendant asked to use his cellular phone to call his

attorney. (Document No. 10, p.5). Blackman denied Defendant's request, and informed Defendant that he would be able to call his attorney once he arrived at the jail. Id.

Brummer testified that he was subsequently notified by the officers who transported Defendant to the Union County Jail that while in transport, Defendant requested to speak with Brummer. (Document No. 30 at 36:40-37:10). Brummer could not recall either who had transported Defendant or who had relayed that message. Id. Nevertheless, the record shows that after Defendant arrived at the Union County Jail, Brummer joined Defendant in an interview room. (Document No. 30 at 36:40-37:10; Document No. 10, p.5; Document No. 20, p.6). Brummer asked Defendant, "For the record, you want to speak with me?" (Document No. 20, p.15). Defendant answered affirmatively. Id. Brummer presented Defendant with a written Miranda waiver form, which Defendant then signed. Id.

### III.     STANDARD OF REVIEW

"A statement is involuntary under the Fifth Amendment only if it is involuntary within the meaning of the Due Process Clause." U.S. v. Braxton, 112 F.3d 777, 780 (4th Cir. 1997). Under the Due Process Clause, a statement is not voluntary if it is "extracted by any sort of threats or violence [or] obtained by any direct or implied promises, however slight, [or] by the exertion of any improper influence." Id. at 786 (quoting Hutto v. Ross, 429 U.S. 28, 30 (1976). Indeed, if the subject's will has been "overborne" or his "capacity for self-determination critically impaired," the resulting statement will be deemed involuntary. Schneckloth v. Bustamonte, 412 U.S. 218, 225 (1973); U.S. v. Pelton, 835 F.2d 1067, 1071-72 (4th Cir. 1987).

Similarly, consent to search must be made knowingly and voluntarily. Bumper v. North Carolina, 391 U.S. 543, 550 (1968). "In determining whether . . . consent . . . was freely and voluntarily given, the totality of the circumstances must be examined, including the

"characteristics of the accused . . . as well as the conditions under which the consent to search was given." U.S. v. Elie, 111 F.3d 1135, 1144 (4th Cir. 1997) (citing Schneckloth, 412 U.S. at 227) (quoting U.S. v. Lattimore, 87 F.3d 647, 650 (4th Cir. 1996)).

A defendant's voluntary statements may not be used in the prosecution's case-in-chief against him if such statements were made by the defendant (1) in the absence of Miranda warnings, (2) in response to interrogation, and (3) while in custody. Miranda v. Arizona, 384 U.S. 436, 444-45 (1966).

Miranda warnings inform a defendant in custody of his rights, among them, his rights to remain silent in the face of police interrogation and to have an attorney present during interrogation. A person is in custody if, under the totality of the circumstances, it appears that there is a "formal arrest or restraint of freedom of movement of the degree associated with a formal arrest." California v. Beheler, 463 U.S. 1121, 1125 (1983) (quoting Oregon v. Mathiason, 429 U.S. 492, 495 (1977). The inquiry also examines "whether, viewed objectively, 'a reasonable man in the suspect's position would have understood his situation' to be one of custody." U.S. v. Hargrove, 625 F.3d 170, 178 (4th Cir. 2010) (quoting Berkemer v. McCarty, 468 U.S. 420, 440, (1984)). If a suspect is in custody, even absent an unambiguous invocation of his right to remain silent, the suspect's statement in response to interrogation is inadmissible absent a valid waiver. Berghuis v. Thompkins, 560 U.S. 370, 382 (2010). Interrogation consists of express questioning and "words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response { "pageset": "Sd4" } from the suspect." Rhode Island v. Innis, 446 U.S. 291, 301 (1980).

When a defendant asserts his right to counsel, "interrogation must cease until an attorney is present." Miranda, 384 U.S. at 474. However, interrogation may resume if "the accused himself

initiates further communication, exchanges, or conversations with the police." Edwards v. Arizona, 451 U.S. 477, 484-85 (1981).

Generally, "a suspect who has once responded to unwarned yet uncoercive questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite Miranda warnings." Oregon v. Elstad, 470 U.S. 298, 318 (1985). However, where questioning of a suspect is "punctuated" only by Miranda warnings such that the pre- and post-Miranda questioning can only reasonably be seen as a single "coordinated and continuous" interrogation, the warnings may be deemed not to satisfy the formal requirements of Miranda. Missouri v. Seibert, 542 U.S. 600, 601, 620 (2004). In that narrow context, unwarned statements may taint warned and voluntary subsequent statements. Id.

## IV.   DISCUSSION

This case presents two major issues:   (1) whether Defendant's Due Process and Fifth Amendment rights were violated such that all statements and evidence obtained on November 22, 2013 should be suppressed;  or in the alternative, (2) whether Defendant's Miranda rights were violated such that some or all of his statements to law enforcement on November 22, 2013 should be suppressed.

### A.   **Fifth Amendment Voluntariness**

The first issue presented is whether Special Agent Blackman made an express or implied promise not to charge Defendant if Defendant turned over the contents of the book bag to law enforcement, and if so, whether there is any legal consequence.

"A statement is involuntary under the Fifth Amendment only if it is involuntary within the meaning of the Due Process Clause," which demands that, in viewing the totality of the circumstances, "the defendant's will has been 'overborne' or his 'capacity for self-determination

critically impaired,'" Braxton, 112 F.3d at 780; Schneckloth, 412 U.S. at 225. A voluntariness inquiry may include "the characteristics of the defendant, the setting of the interview, and the details of the interrogation." Pelton, 835 F.2d at 1071 (citing U.S. v. Wertz, 625 F.2d 1128, 1134 (4th Cir. 1980). Relevant characteristics of the defendant include "age, maturity, education, intelligence, and experience." Lattimore, 87 F.3d at 650.

A confession is involuntary if it is "extracted by any sort of threats or violence, or obtained by any direct or implied promises, however slight, or by the extension of any improper influence." Hutto v. Ross, 429 U.S. at 30. "[T]here are certain promises whose attraction renders a resulting confession involuntary if the promises are not kept, and the defendant's perception of what government agents have promised is an important factor in determining voluntariness." U.S. v. Shears, 762 F.2d 397, 402 (4th Cir. 1985). Specifically, where a defendant reasonably perceives that he has been promised that "all charges on unrelated offenses [will] be dropped," and that perceived promise is "the principal and determinative factor leading to his confession," that statement is involuntary. Id. at n.5 (citing Grades v. Boles, 398 F.2d 409, 412 (4th Cir. 1968)).

However, "government agents may validly make some representations to a defendant or may discuss cooperation without rendering the resulting confession involuntary. Government agents may even be able to make and breach certain promises without rendering a resulting confession involuntary." Id. at 401-02. General warning about charges and penalties are not considered impermissible implied threats or promises. Braxton, 112 F.3d at 782; Pelton, 835 F.2d at 1073; U.S. v. Mashburn, 406 F.3d 303, 309-10 (4th Cir. 2005). Indeed, "[t]ruthful statement[s] about [the defendant's] predicament are not the type of coercion that threatens to render a statement involuntary." Braxton, 112 F.3d at 782.

Consent to a search must be given freely and voluntarily. <u>Schneckloth</u>, 412 U.S. at 222; <u>U.S. v. Mendenhall</u>, 446 U.S. at 557. "Account must be taken of subtly coercive police questions, as well as the possibly vulnerable subjective state of the person who consents." <u>Schneckloth</u>, 412 U.S. at 228-29. Nevertheless, consent may be found to have been voluntary given in the absence of <u>Miranda</u> warnings, or by a suspect in custody, in handcuffs, or at gunpoint. <u>Elie</u>, 111 F.3d at 1140.

> In suppression cases, the challenged evidence is usually "direct" in its "relationship to the prior arrest, search, [or] interrogation." Wayne R. LaFave & Jerald H. Israel, Criminal Procedure § 9.3(a), at 734 (1984). Examples of this type of evidence include statements made in response to police questioning, such as [a defendant's] statement that he had weapons . . . and physical evidence found as a result of a search or arrest. If the arrest, search, or interrogation was unlawful, the direct evidence, absent an exception to the exclusionary rule, must be suppressed.

<u>Id.</u>

Defendant alleges that while in the law enforcement vehicle on Brown Street, Agent Blackman "promised" not to charge Defendant if Defendant identified and/or produced the contents of the book bag. (Document No. 10, p.4). The basis for Defendant's allegation, revealed at the hearing, was Blackman's statement to Defendant that Defendant should talk to the officers because Defendant "didn't want to get caught up in a murder investigation." (Document No. 20, pp.9, 12; Document No. 31 at 15:45-16:10). Defendant alleges that he perceived that statement to mean that if he cooperated by revealing the black bag's contents and delivering the contents of the bag to law enforcement, Defendant would not be charged with any crime. <u>Id.</u> Defendant contends that because Defendant's inculpatory statements and consent to search were made solely on the basis of Blackman's promise, Defendant's statements and consent were involuntary. (Document No. 10, p.9-10). Defendant alleges also that the unconstitutional coercion of the

promise tainted subsequent statements, including those made after formal Miranda warnings, rendering all subsequent statements subject to the exclusionary rule as "fruit of the poisonous tree." (Document No. 10, pp.13-14).

Defendant argues that because Blackman knew of Defendant's criminal history and believed Defendant had committed a crime, Blackman would have known that a promise would be necessary to convince Defendant to cooperate. (Document No. 31 at 1:08:21-1:11:22). Defendant points also to Defendant's aggressive reaction to the language of the Miranda waiver that "[n]o promise[s] or threats have been made to me," and contends that Defendant refused to sign because he believed that a promise had been made to him. (Document No. 10, p.5). Defendant also relies on the subsequent interrogation of Defendant at the Union County Jail, during which Brummer said "Yeah, I'm with you," in response to Defendant's claim that he was told he would not be charged. Defendant notes also Brummer's characterization of Blackman as an "asshole," allegedly because Blackman had made and broken his promise not to charge Defendant. (Document No. 30 at 2:09:09-2:13:39).

The Government counters that Defendant assumed (incorrectly) that he would not be charged if he cooperated with law enforcement. The Government cites Defendant's recorded statements during subsequent interrogations, "you going to get me to take you to the gun. That's all you said, take me to the . . . *you didn't say nothing about charging me*," to demonstrate Defendant's assumption. (Document No. 20, p. 5 (emphasis added)). Blackman and Brummer both testified that Blackman did encourage Defendant to reveal what he knew so as not to "get caught up in a murder investigation." However, the Government characterizes that statement as truthful to Defendant's situation, and not a promise to Defendant. (Document No. 20, p.9, 12).

To find Defendant's statements and consent to be involuntary, this Court would have to find that Defendant "reasonably perceived" Blackman to have made a **direct or implied** promise, and that the promise was "the principal and determinative factor leading to" Defendant's inculpatory statements and consent. <u>Shears</u>, 762 F.2d at 402 & n.5. There is no basis whatever to conclude that Blackman's statement was a direct promise not to charge Defendant. Neither can the Court agree, despite the sensitivity demanded by Fourth, Fifth and Fourteenth Amendment jurisprudence with respect to coercion and voluntariness, that Blackman's statement constituted an indirect promise. Thus, the Court finds that Defendant's statements and consent were voluntary.

First, the Defendant could not have reasonably perceived Blackman's statement, "you don't want to get caught up in a murder investigation," to be **an** indirect promise. Blackman's statement referenced an ongoing murder investigation. It would not be reasonable for Defendant to believe, given the gravity of a homicide, that a law enforcement officer would promise to overlook involvement in such a crime. Nor would it be reasonable for Defendant to believe that Blackman, as a law enforcement officer and without knowing what crimes Defendant may have committed, would promise to overlook peripheral criminal activity and forfeit criminal charges.

Second, even if the statement could be construed as a promise, it does not follow that such promise was "the principal and determinative factor" leading to Defendant's statements and consent. When Defendant initially denied having retrieved the bag or possession of its contents, Blackman not only made the statement Defendant allegedly construed as a promise, but also revealed to Defendant the basis for his belief that Defendant had retrieved the bag. Specifically, Blackman told Defendant what he had overheard on the jail calls—that Defendant agreed to, and did in fact, pick up the book bag from L.B. Thus, it is likely Defendant admitted to retrieving the book bag "principally" because Blackman already knew Defendant had done so. Similarly,

Defendant likely consented to allow Blackman and Brummer to enter the residence to retrieve the shotgun because its discovery, based on the extent of Blackman's prior knowledge, appeared inevitable. Thus, it is likely that the principal and determinative factor leading to Defendant's inculpatory statements and consent to search was not a promise not to be charged, but rather a desire to minimize the repercussions of Defendant's illegal conduct.

Defendant argues that prior to questioning, Blackman knew of Defendant's criminal history and believed Defendant had committed a crime. Thus, Defendant argues, Blackman would have known that Defendant would not cooperate absent some promise. The Court is not persuaded. The Defendant's criminal history makes not only the existence of such a promise less likely, but also Defendant's alleged perception that such a promise had been made less reasonable. If Blackman had believed that Defendant had committed a crime, he would not likely have compromised his ability to charge Defendant by making a promise, particularly if he was aware of Defendant's full criminal history. For Defendant's part, because Defendant subjectively knew that his possession of a shotgun constituted a felony, Defendant could not have reasonably believed that cooperation would shield him from being charged.

Neither is the Court persuaded by Defendant's reaction to the language of the <u>Miranda</u> waiver or Brummer's references to Blackman during the Union County Jail interview. Defendant argues that it was precisely because Blackman had promised Defendant not to charge him with anything that Defendant reacted aggressively to the suggestion that "[n]o promise[s] or threats [had] been made to [him]. . . ." (Document No. 10, p.5). Defendant also relies on Brummer's response to Defendant's claim that he was told he would not be charged, "Yeah, I'm with you," and Brummer's characterization of Blackman as an "asshole," allegedly because Blackman had broken a promise to Defendant. As the Government points out, Defendant signed a waiver form

containing the same language later that day.  It is unlikely that Defendant would have done so if a promise had indeed been made.  As to Brummer's comments during the interview at the Union County Jail, establishing common ground and building rapport with Defendant can easily be characterized as an interview tactic.  Thus, this Court does not find that Brummer's statements were intended to assert Brummer's actual agreement with Defendant's factual assertions;  rather, they were intended to diminish the adversarial environment of the interview.

Based on all this, the undersigned concludes that Blackman did not make a statement that could be construed as a "promise" or critically impaired Defendant's capacity for self-determination. The Court thus finds Defendant's inculpatory statements and consent to search to be voluntary.  Said statements and the evidence yielded by that search are thus admissible.  Further, because there was no Due Process violation, no subsequent statements need be considered for suppression on that basis, subject to the Miranda analysis which follows.

**B.**     **Alleged Miranda Violations**

In Miranda v. Arizona, the Supreme Court held the following:

> [W]hen an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, the privilege against self-incrimination is jeopardized.     Procedural safeguards must be employed to { "pageset": "Sd4 protect the privilege and unless other fully effective means are adopted to notify the person of his right of silence and to assure that the exercise of the right will be scrupulously honored, the following measures are required.  He must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.  Opportunity to exercise these rights must be afforded to him throughout the interrogation.  After such warnings have been given, and such opportunity afforded him, the individual may knowingly and intelligently waive these rights and agree to answer questions or make a statement.  But unless and until such warnings

> and waiver are demonstrated by the prosecution at trial, no evidence
> obtained as a result of interrogation can be used against him.

Miranda, 384 U.S. at 478-479.

Defendant alleges that all of Defendant's statements from November 22, 2013 should be suppressed because such statements were elicited in violation of Defendant's Miranda rights. Specifically, Defendant alleges that Defendant's statements should be suppressed because, first, Defendant was in custody for Miranda purposes when he was interrogated in a law enforcement vehicle parked in front of 504 Brown Street. Second, Defendant alleges that subsequent interrogations at the Monroe Police Department and the Union County Jail were so continuous that statements made at each subsequent location should also be suppressed as fruit of the poisonous tree. Finally, Defendant alleges that, after invoking Defendant's right to an attorney, Defendant was again interrogated without having been afforded that right. The alleged Miranda violations will be examined in the following order: (1) Interrogation at 504 Brown Street; (2) Interrogation at the Monroe Police Department; (3) Interrogation at the Union County Jail.

## 1. Interrogation at 504 Brown Street

The first issue is whether Defendant was in custody when questioned in the law enforcement vehicle at 504 Brown Street. If so, the officers' failure to provide Miranda warnings prior to interrogation constitutes sufficient grounds to suppress Defendant's statements made while in the vehicle. Moreover, if Defendant was in custody, and subsequent interrogations were sufficiently continuous, subsequent Miranda warnings could be insufficient to cure the initial Miranda violation.

Under the Fourth Amendment, a person had been seized "if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. Michigan v. Chesternut, 486 U.S. 567, 572 (1988). Custody for Miranda purposes

requires that and something more.   As summarized by the Supreme Court in <u>Thompson v. Keohane</u>,

> Two discrete inquiries are essential to the determination:  first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave.  Once the scene is set and the players' lines and actions are reconstructed, the court must apply an objective test to resolve "the ultimate inquiry":   *"[was] there a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest."* <u>California v. Beheler,</u> 463 U.S. at 1125 (quoting <u>Oregon v. Mathiason,</u> 429 U.S. 492, 495 (1977)).

516 U.S. 99, 100 (2013) (emphasis added).  Though "[a]ny interview of one suspected of a crime will have coercive aspects to it," "general questioning of citizens in the fact-finding process" does not implicate <u>Miranda.  Mathiason</u>, 429 U.S. at 495;  <u>Miranda</u>, 384 U.S. at 477-78.

Without more, an officer's "mere presence" in a doorway does not restrain a defendant's "freedom of movement in a manner consistent with being in custody."  <u>Hargrove,</u> 625 F.3d at 182.  Some of the circumstances that shape a determination of custody are the suspect's isolation and separation from family, "the time, place and purpose of the encounter . . . the presence of multiple officers, the potential display of a weapon by an officer, and whether there was any physical contact between the officer and the defendant."  <u>U.S. v. Day</u>, 591 F.3d 679, 696 (4th Cir. 2010) (quoting <u>United States v. Weaver</u>, 282 F.3d 302, 312 (4th Cir. 2002) (internal quotation marks omitted)).  <u>See also</u> <u>U.S. v. Hashime</u>, 734 F.3d 278, 283 (4th Cir. 2013) (finding of custody where suspect was isolated from his family members during three-hour interrogation and family members' repeated requests to see defendant were denied);  <u>U.S. v. Musgrave</u>, 726 F. Supp. 1027, 1032 (W.D.N.C 1989) (finding of custody where eight officers entered the suspect's small apartment to execute a search warrant, suspect had reasonable belief he had no choice but to follow agents into back bedroom);  <u>U.S. v. Colonna</u>, 511 F.3d 431, 433 (4th Cir. 2007) (finding of custody

where suspect's home was "inundated" with twenty-four FBI Officers that told the suspect and his family where to sit and restricted their access to the home). But see Hargrove, 625 F.3d at 179 (no finding of custody despite custodial level of control during initial safety sweep of residence by ten to fifteen officers).

"Custody determinations do not depend on the subjective views of either the interrogating law enforcement officers or of the person being questioned, but depend instead the objective circumstances of the interrogation. The agent's unarticulated views . . . is of little weight." U.S. v. Parker, 262 F.3d 415, 419 (4th Cir. 2001) (citing Stansbury v. California, 511 U.S. 318, 323 (1994)).

Defendant argues that Defendant was in custody because officers "controlled and curtailed [Defendant's] freedom of movement the entire time," and a reasonable person in defendant's position would not have felt free to leave.   (Document No. 10, p.8).  Defendant contends that by positioning officers at the front and back doors and placing Defendant in the law enforcement vehicle for interrogation, officers actually prevented Defendant from leaving.  Id.  Defendant asserts that officers isolated Defendant in the law enforcement vehicle, preventing Defendant from speaking with friends and family, and interrogated Defendant until he revealed inculpatory information.  Id.  Defendant notes also the sheer number of law enforcement officers and vehicles, three and four respectively.  Id.  Finally, Defendant suggests that officers sought out Defendant with the intent to arrest him and therefore would not have allowed Defendant to leave.  (Document No. 31 at 1:02:00-1:02:40).  Defendant thus argues that he was in custody for the purposes of Miranda.

In contrast, the Government argues that the encounter between officers and the Defendant, including the discussion in the law enforcement vehicle and Defendant's reentry of the house to

reveal the location of the firearm, was a consensual encounter akin to a "knock and talk." (Document No. 20, p.6). The Government contends that Defendant consented to speak to officers in the law enforcement vehicle because it was cold, and to that end voluntarily exited the house and independently entered and exited the law enforcement vehicle himself (Document No. 20, pp. 2-4, 6-10). Further, despite Defendant's initial reluctance, once Blackman revealed what he had overheard on the jail calls, Defendant quickly admitted having retrieved the bag; the interrogation lasted less than ten minutes. (Document No. 20, pp.3-4). Finally, the Government argues the officers who initiated contact with Defendant did not appear to be in uniform and had no visible weapons, and that of the two police vehicles nearby, only one, an unmarked white Ford Fusion, was parked in front of the house. (Document No. 20, pp.2-3). The Government maintains that none of the officers had any intention of, or grounds upon which to, detain Defendant until they located the shotgun, learned Defendant was a felon, and observed marijuana in plain view. (Document No. 30 at 1:24:15-1:24:41; Document No. 31 at 1:02:17-1:02:35).

Defendant's argument that he was prevented from leaving his house is without merit. Though law enforcement officers came to Defendant's door and another officer went around to the back of the house, the officers' "mere presence" is not enough. Officers neither prevented Defendant from leaving on his own volition nor coerced him to remain in the house. For the same reason, Defendant's suggestion that officers prevented him from leaving by placing him in the vehicle also fails. The evidence tends to show that Blackman and Brummer did not order Defendant to the vehicle, show or use their weapons, or make physical contact with Defendant at any point prior to or during the interview in the vehicle. Rather, Defendant was asked if he would mind speaking with the officers in the law enforcement vehicle, walked to and from the vehicle

independently, and himself opened the door of the vehicle to get in and out. Thus, Defendant was neither prevented from leaving his home or the law enforcement vehicle.

Defendant's argument that officers isolated and questioned Defendant until he revealed inculpatory information does little to bolster Defendant's assertion that he was in custody. With respect to the alleged isolation, Agent Blackman testified that they moved to the vehicle because it was cold outside and Detective Brummer felt it would protect Defendant's privacy. Both officers asserted that they *asked* Defendant if he would mind moving to the vehicle, and it appears that they did so only after Defendant declined to invite them inside. Moreover, the record shows that Defendant closed the door behind him when he returned to the door to speak with officers, in effect himself excluding Ms. Shannon from his communication with the officers. Defendant has not alleged that he requested to speak with Ms. Shannon or anyone else at any point during the interrogation, nor that Ms. Shannon requested to see Defendant during the interrogation. Thus, in these circumstances, any isolation seems incidental rather than intentional. See Hashime, 734 F.3d at 284. Similarly coincidental and uncompelling is the fact that Defendant was questioned until he made an inculpatory statement. The ten- to twenty-minute duration of the interview here hardly suggests that Defendant would have been isolated and interrogated for an unreasonable or extended period of time had he not so quickly decided to cooperate. See Colonna, 511 F.3d at 435.

Despite Defendant's efforts to emphasize the number of law enforcement vehicles and personnel on the scene, the record does not reflect a police presence or show of authority sufficient to suggest custody. Here, only two or three agents—all in plain clothes—knocked on Defendant's door. No weapons were drawn. In fact, Blackman and Brummer both testified that their weapons were covered by their jackets. Though there is a conflict as to how many law enforcement vehicles were on the scene, the evidence tends to show that the vehicles that were visible were unmarked.

Also in question is the presence of three additional officers that Defendant states he passed on the way to Blackman's vehicle. Even if additional officers had arrived at the residence, there is little evidence to show that officers overtook a small space, inundated the home in large numbers, or ordered Defendant and Ms. Shannon's movements. Musgrave, 726 F. Supp. at 1032; Colonna, 511 F.3d at 433. Rather, it would appear that the officers endeavored to question Defendant in the fact-finding process. Miranda, 384 U.S. at 477. This jurisdiction has not found custody on a show of authority such as the one presented here.

Finally, the Court cannot conclude either that officers subjectively believed that Defendant had committed a crime and therefore would not have allowed Defendant to leave, or that such a belief, if held, would equate to a finding of custody. At the outset, Blackman and Brummer both testified that: (1) they did not attempt to locate and speak with Defendant with the intention of arresting him; (2) they did not know or have any particular suspicion that the black bag contained a weapon; (3) they did not know Defendant was a felon; (4) they did not believe, until those facts were revealed, that Defendant had committed a crime; and (5) until those facts were revealed, they would have been required to allow Defendant to end the encounter and/or leave the premises. Moreover, because both the custodial restraint and freedom to leave prongs of a custody analysis are objective, even if officers suspected that the encounter would end in an arrest, such suspicion is "of little weight." Parker, 262 F.3d at 419. Thus, even if, contrary to testimony, the officers' prior knowledge of Defendant's criminal history and the information contained in the jail calls together led officers to subjectively intend to prevent Defendant from leaving the premises, the officers' subjective intent does not render the Defendant in custody.

In sum, because Defendant was not physically prevented from leaving and voluntarily entered the law enforcement vehicle, the Court finds that Defendant's freedom of movement was

not curtailed to a degree associated with a formal arrest. Similarly, neither the character or the duration of the interrogation, nor the police presence, would lead a reasonable person in Defendant's position to believe that he was not free to leave. Thus, Defendant was not in custody when questioned in the police vehicle, and Miranda warnings were not required. Therefore, Defendant's statements at 504 Brown Street need not be suppressed.

### 2.    Interrogation at the Monroe Police Department

The next issue is whether Defendant's statements made at the Monroe Police Department were obtained in violation of Miranda. The Court finds that the statements were elicited absent a valid waiver of Defendant's rights, and therefore should be suppressed.

The Supreme Court has held that if a suspect "indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." Burket v. Angelone, 208 F.3d 172, 200 (4th Cir. 2000) (quoting Miranda, 384 U.S. at 473–74). However, "[e]ven absent the accused's invocation of the right to remain silent, the accused's statement during a custodial interrogation is inadmissible at trial unless the prosecution can establish that the accused 'in fact knowingly and voluntarily waived [Miranda] rights' when making the statement." Berghuis, 560 U.S. at 382-383 (quoting North Carolina v. Butler, 441 U.S. 369, 373 (1979)).

As to interrogation,

> Miranda safeguards come into play whenever a person in custody is subjected to either express { "pageset": "Sd4 questioning or its functional equivalent. That is to say, the term "interrogation" under Miranda refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response { "pageset": "Sd4 from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police.

<u>Innis,</u> 446 U.S. at 292.

The Government has conceded that just after Blackman was shown the shotgun by Defendant and learned that Defendant was a felon, Defendant was "in custody." (Document No. 20, p.9). As noted in the statement of facts, Defendant was then transferred to the Monroe Police Department. (Document No. 10, p.4). There, Brummer reviewed a written <u>Miranda</u> waiver form with Defendant. (Document No. 31 at 27:23-27:31). Defendant acknowledged his rights and initialed the form to indicate that acknowledgement. (Gov'ts. Ex. No. 3). However, when Brummer read the final statement, "[no] promise or threats have been made to me and no pressure or coercion of any kind has been used against me," Defendant refused to sign the <u>Miranda</u> waiver, and a flurry of discussion followed. (Document No. 31 at 33:41-36:29). The Government characterizes the discussion as Blackman attempting to defend his position in order to come to an understanding. (Document No. 31 at 2:57:30-2:58:22). Moreover, the Government contends that even the express questions Blackman asked do not constitute interrogation. <u>Id.</u> Rather, the Government argues, Blackman was engaged by Defendant. <u>Id.</u> The undersigned cannot agree.

Defendant's refusal to sign the <u>Miranda</u> waiver was a clear indication that Defendant was invoking his right to remain silent. Moreover, in saying "if you don't want to talk more about it, then that, that is your right and I can't, I can't force you to," Blackman acknowledged Defendant's invocation. (Document No. 31 at 35:4-35:54). However, even if Defendant's actions did not expressly invoke his right to remain silent, neither did he waive that right. <u>Miranda</u> dictates that interrogation should have ceased at that time. It did not. The undersigned finds that interrogation continued, and Defendant's statements were made in the absence of a valid waiver

First, Blackman should have known that his statement to Defendant that he couldn't "look the other way on that brick of marijuana that's sitting there . . . " was likely to elicit an incriminating response. Like Blackman's earlier words of caution to Defendant not to "get caught up" in a murder investigation elicited an incriminating response, Blackman's post-invocation statement that law enforcement could not "get to the bottom of this whole deal" again referenced the murder investigation. Because reference to the murder investigation had elicited incriminating statements earlier, Blackman should have known that the threat of being associated with a homicide might again elicit an incriminating response.

Second, even if Blackman's general statements were not sufficiently likely to elicit an incriminating response, Blackman also expressly asked Defendant, among other questions, "Alright, all I asked you was if you were a felon and what did you say?" Blackman even said, "hang on, just let me ask the questions first . . . ."

Finally, despite Government's characterization of Blackman's continuing statements as defensive rather than offensive, and strictly not intended to elicit incriminating statements, Blackman's subjective intent is not relevant. Because the inquiry focuses on the "perceptions of the suspect, rather than the intent of the police," Innis, 446 U.S. at 292, whether or not Blackman intended his statements following Defendant's refusal to sign to be coercive or to elicit inculpatory responses, Blackman's statements constituted interrogation.

Thus, because Blackman should have known his statements were sufficiently likely to elicit an incriminating response, Blackman in some instances asked direct questions, and any intent to come to agreement rather than interrogate is not relevant, Defendant was subjected to custodial interrogation without having waived his right to silence. Defendant's statements at

the Monroe Police Department were thus elicited in violation of <u>Miranda</u>, and therefore should be suppressed.

### 3. <u>Interrogation at the Union County Jail</u>

The interrogation at the Union County Jail raises two issues: (a) whether law enforcement officers violated Defendant's <u>Miranda</u> rights where Defendant invoked his right to counsel; and (b) whether the interrogation at the Monroe Police Department—where Defendant's <u>Miranda</u> rights were violated—and the Union County Jail—where Defendant was read and waived his <u>Miranda</u> rights—were so coordinated or continuous that the former violation tainted the latter statement.

### a. Invocation of Right to Counsel

Despite Defendant's invocation of his rights under <u>Miranda,</u> this Court finds that in interrogating Defendant at the Union County Jail, no <u>Miranda</u> violation occurred because Defendant subsequently waived that right.

To invoke his right to counsel, a suspect must "articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." <u>Davis v. U.S.</u>, 512 U.S. 452, 459 (1994). When a defendant has invoked his right to counsel, all interrogation of that defendant must cease until counsel has been provided "unless the accused himself initiates further communication, exchanges, or conversations with the police." <u>Edwards</u>, 451 U.S. at 484-85.

It is undisputed that Blackman and Brummer interpreted Defendant's "adamant" request to use his cell phone to call his lawyer as an invocation of Defendant's right to counsel. (Document No. 20, p.14; Document No. 30 at 1:56:36-1:57:03). However, the record shows that upon arrival at the Union County Jail, Defendant was taken not to a phone, but to an interrogation room.

(Document No. 10, p.5).  Defendant thus argues that statements elicited during the interrogation that took place at the Union County Jail should be suppressed as a further violation of Defendant's rights under <u>Miranda.</u>  (Document No. 10, p.10).

In response, the Government asserts that Defendant's rights were not violated because once Defendant invoked his right to counsel, interrogation ceased in response to that invocation. [5] (Document No. 31 at 39:31-39:37, 2:58:20-2:58:22).  However, the Government contends that Defendant initiated further communication with police by specifically requesting to speak with Brummer again.  The Government thus argues that because Defendant, not law enforcement, initiated the contact after interrogation ceased, Defendant waived his right to have an attorney present during questioning.  <u>Id.</u>  This court finds that the testimony and the evidence support the Government's contention.

Several events circumstantially demonstrate that Defendant initiated contact.  First, at the conclusion of the Monroe Police Department interview, Brummer gave Defendant Brummer's card and contact information, and invited Defendant to contact Brummer if he wanted to talk. Next, Brummer testified that he received a call informing him that while Defendant was being transported to the jail, Defendant requested to speak specifically with Brummer.  Third, Brummer actually went to the Union County Jail and met with Defendant in an interrogation room.  Fourth, before presenting a <u>Miranda</u> waiver form to Defendant, Brummer said, "For the record, you want to talk to me," and Defendant confirmed that he did.  Though Brummer does not recall who informed him that Defendant wished to speak with him, the Court finds the circumstantial evidence of such a request to be persuasive.  The undersigned thus finds that Defendant initiated contact

---

[5] The Government argues also that Defendant's right to counsel, as provided by the Sixth Amendment, had not yet attached.  (Document No. 20, p.14).

with Brummer.  Therefore, the interrogation at the Union County Jail did not occur in violation of Defendant's express invocation of his right to counsel.

**b.      Taint from <u>Miranda</u> Violation at the Monroe Police Department**

This Court similarly finds that the interrogation at the Union County Jail was not a continuation of the interview at the Monroe Police Department.  Thus, the <u>Miranda</u> violation that occurred at the Monroe Police Department did not taint or render Defendant's waiver at the Union County Jail invalid.

Generally, "a suspect who has once responded to unwarned yet uncoercive questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite <u>Miranda</u> warnings."  <u>Elstad</u>, 470 U.S. at 318.  However, "it is unrealistic to treat two spates of integrated and proximately conducted questioning as independent interrogations subject to independent evaluation simply because <u>Miranda</u> warnings formally punctuate them in the middle."  <u>Seibert</u>, 542 U.S. at 614.  Thus, "when <u>Miranda</u> warnings are inserted in the midst of *coordinated and continuing* interrogation," and such warnings fail to "reasonably convey to a suspect his rights," a suspect's statements may yet be suppressed despite formal compliance with <u>Miranda</u>.  <u>Id.</u> at 610-11, 613-14 (emphasis added) (quoting <u>Duckworth v. Eagan</u>, 492 U.S. 195, 203 (1989) (internal citations omitted)).  To determine whether a subsequent interrogation is "coordinated and continuing" a court should consider

> the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and second, the continuity of police personnel, and the degree to which the interrogators' questions treated the second round as continuous with the first.

Id. at 601-02.

Defendant argues that the interrogation at Brown Street violated Defendant's Miranda rights, and that statements made subsequent were so continuous despite proper Miranda warnings that they should also be suppressed. (Document No. 10, pp. 10-12). Defendant claims that because the two interrogations subsequent to the unwarned interrogation in the law enforcement vehicle at Brown Street were conducted by the same officers and pertained to the same subject matter, the interrogation was continuous and the resulting statements are inadmissible. (Document No. 10, p.10-12).

The Government does not address the merits of the argument that the interrogation was continuous, but contends that because Defendant was not in custody during the Brown Street interrogation, there was no Miranda violation upon which to invalidate a subsequent interrogation. (Document No. 20, p.15).

Though this Court agrees that Defendant was not in custody during the Brown Street interview, it also found that officers did violate Defendant's Miranda rights during the interrogation that occurred at the Monroe Police Department. Thus, the violation that occurred during the Monroe Police Department interrogation could still render the Union County Jail interrogation inadmissible if sufficiently continuous. However, the undersigned concludes that the circumstances do not warrant such a finding in this case.

Though Defendant was interrogated while at the Monroe Police Department as a matter of law, the factors that would suggest that subsequent interrogations were coordinated or continuous are absent here. Defendant was not asked complete or detailed questions, nor did Defendant provide complete or detailed information at that time. While, as Defendant observes, there was overlapping content in that the subject of the questioning was the same, this is not a case where a

suspect made two statements consisting of nearly identical content. Similarly, while there was some continuity of police personnel (Brummer was present during both interrogations), the interrogations were separated by transport to another location by different law enforcement personnel. Thus, rather than being a single continuous and coordinated interrogation "punctuated" solely by <u>Miranda</u> warnings, here, the interviews were distinct. Therefore, the violation of Defendant's <u>Miranda</u> rights at the Monroe Police Department interrogation does not render ineffective <u>Miranda</u> warnings or Defendant's waiver of his rights at the Union County Jail.

## V.    CONCLUSION

In conclusion, based on the foregoing, Defendant's statements and consent were not involuntary because Defendant's will was not, at any point, overborne, nor his capacity for self-determination impaired, by statements made by law enforcement. Blackman's remark that Defendant "did not want to get caught up in a murder investigation" could not have reasonably been interpreted to be a promise that if Defendant cooperated, he would not be charged with any crimes. Thus, because no promise was made that would render either Defendant's initial statements or consent to search involuntary, no statements or physical evidence obtained in reliance on consent need be suppressed on those grounds.

Defendant's <u>Miranda</u> rights were violated, though not nearly to the extent claimed by Defendant. Statements made in the law enforcement vehicle at Brown Street are admissible. Defendant was not in custody during that interview, and thus, neither the absence of <u>Miranda</u> warnings nor of a valid waiver requires suppression of Defendant's Brown Street statements.

However, statements made in the interrogation room at the Monroe Police Department must be suppressed. Though Defendant elected not to waive his <u>Miranda</u> rights upon arrival at the Monroe Police Department, custodial interrogation continued. Custodial interrogation in the

absence of a valid <u>Miranda</u> waiver constitutes a <u>Miranda</u> violation, which requires suppression. Thus, Defendant's statements at the Monroe Police Department are not admissible at trial.

Defendant's statements made at the Union County Jail are admissible. Before leaving the Monroe Police Department, Defendant did invoke his right to counsel. However, Defendant subsequently initiated further conversation with law enforcement officers, which waived his prior invocation, allowing contact to resume. Further, the interrogation at the Union County Jail was not a coordinated continuation of the tainted Monroe Police Department interrogation "punctuated" by <u>Miranda</u> warnings. Rather, because interrogation by, and contact with, the interrogating officers ceased while Defendant was transported to another location, the <u>Miranda</u> violation which occurred at Monroe Police Department does not warrant the suppression of properly warned statements made subsequently.

## VI.    RECOMMENDATION

**FOR THE FOREGOING REASONS**, the undersigned respectfully recommends that the "Motion to Suppress" (Document No. 10) be <u>denied</u> in part and <u>granted</u> in part. Defendant's statements at the Monroe Police Department should be suppressed. All other statements and evidence at issue in this motion are admissible against Defendant.

## VII.    TIME FOR OBJECTIONS

The parties are hereby advised that pursuant to 28 U.S.C. § 636(b)(1)(C), and Rule 72 of the Federal Rules of Civil Procedure, written objections to the proposed findings of fact, conclusions of law, and recommendation contained herein may be filed within **fourteen (14) days** of service of same. Responses to objections may be filed within fourteen (14) days after service of the objections. Fed.R.Civ.P. 72(b)(2). Failure to file objections to this Memorandum and Recommendation with the District Court constitutes a waiver of the right to *de novo* review by the

District Court.  Diamond v. Colonial Life, 416 F.3d 310, 315-16 (4th Cir. 2005).  Moreover, failure to file timely objections will preclude the parties from raising such objections on appeal.  Diamond, 416 F.3d at 316;  Page v. Lee, 337 F.3d 411, 416 n.3 (4th Cir. 2003);  Snyder v. Ridenhour, 889 F.2d 1363, 1365 (4th Cir. 1989);  Thomas v. Arn, 474 U.S. 140, 147-48 (1985), reh'g denied, 474 U.S. 1111 (1986).

**IT IS SO RECOMMENDED**.


Signed: March 4, 2016


David C. Keesler
United States Magistrate Judge